UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Bassam Assaf, M.D., | ) | |
|     Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 10-4021 |
| | ) | |
| Trinity Medical Center, | ) | |
|     Defendant | ) | |

## OPINION

The parties have consented to have this case heard to judgment by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the District Judge has referred the case to me. Now before the Court is the Plaintiff's motion for summary judgment (#16). The motion is fully briefed and I have carefully considered the arguments and evidence of the parties. As stated herein, the motion is GRANTED.

## JURISDICTION AND VENUE

Plaintiff Bassam Assaf filed suit against Defendant Trinity Medical Center in the 14th Judicial Circuit, Rock Island County, Illinois. Defendant removed the case pursuant to 28 U.S.C. 1446 on the basis of diversity jurisdiction.

The Notice of Removal states that Plaintiff is a citizen of Syria, and that. Defendant is a not-for-profit corporation under Illinois law. Pursuant to Defendant's supplemental jurisdictional statement (Doc. #22), it has its principle place of business in Rock Island, Illinois. The parties are therefore diverse. Count I of the complaint seeks $50,000 for his lost salary for the year 2009.. Count II seeks an unspecified amount of lost income from August 17, 2009 through July 10, 2011. Count III seeks $31,369. The matter in controversy therefore exceeds the statutory minimum of $75,000.

1

This Court has jurisdiction pursuant to 28 U.S.C. 1332(a)(2).

Venue is proper in the Central District of Illinois, Rock Island Division, because that is the location where the underlying events occurred.

**MOTIONS FOR SUMMARY JUDGMENT GENERALLY**

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment should be entered if and only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. See <u>Jay v. Intermet Wagner Inc.</u>, 233 F.3d 1014, 1016 (7th Cir.2000); <u>Cox v. Acme Health Serv.</u>, 55 F.3d 1304, 1308 (7th Cir. 1995).

In ruling on a summary judgment motion, the court may not weigh the evidence or resolve issues of fact; disputed facts must be left for resolution at trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986). The court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. <u>Waldridge v. American Hoechst Corp.</u>, 24 F.3d 918, 922 (7th Cir.1994). The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial.

The court is to examine all admissible facts, viewing the entirety of the record and accepting all facts and drawing all reasonable inferences in favor of the non-movant, <u>Erdman v. City of Ft. Atkinson</u>, 84 F.3d 960, 961 (7th Cir. 1996); <u>Vukadinovich v. Bd. of Sch. Trustees</u>, 978 F.2d 403, 408 (7th Cir. 1992), cert. denied, 510 U.S. 844 (1993); <u>Lohorn v. Michal</u>, 913 F.2d 327, 331 (7th Cir. 1990); <u>DeValk Lincoln-Mercury, Inc. V. Ford Motor Co.,</u> 811 F.2d 326, 329 (7th Cir. 1987);

Bartman v. Allis Chalmers Corp., 799 F.2d 311, 312 (7th Cir. 1986), cert. denied, 479 U.S. 1092 (1987), and construing any doubts against the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970); Trotter v. Anderson, 417 F.2d 1191 (7th Cir. 1969); Haefling v. United Parcel Serv., Inc., 169 F.3d 494, 497 (7th Cir.1999).

## UNDISPUTED FACTS

The issue raised by the pending motion is whether the parties entered into a final and enforceable settlement contract when Dr. Assaf and Tom Tibbitts signed a document titled "Settlement Agreement" on February 26, 2010, or whether that document was merely a preliminary summary of the terms of agreement reached orally, which were subject to further review and amendment.

The record in this case includes numerous documents, the authenticity of those documents is not disputed. From those documents, and from the parties' subsequent conduct as it is reflected in those documents, the Court can determine what the parties' intent was as to the February 26, 2009 document. Hence, an abbreviated statement of facts, with details about the documents but with nothing about the parties' subjective thoughts or intentions, follows.

Dr. Bassam Assaf is a Board Certified Neurologist. Beginning in 2005, he served as the Epilepsy Medical Director for Trinity Medical Center ("TMC") pursuant to a written Medical Director Agreement ("MDA"). This MDA is also referred to by the parties as the "Epilepsy Agreement." The terms of the MDA were very important to Dr. Assaf, as they affected the status of his visa. As is pertinent here, the MDA set out his salary, the number of hours he was expected to work, how to document those hours, and how termination of the MDA could be effected.

In 2008, TMC gave Dr. Assaf 90 days written notice that the MDA would not continue after

3

the end of the year. Dr. Assaf continued to work until August 17, 2009, when TMC sent him a termination letter.

Dr. Assaf filed discrimination charges with the EEOC, the Illinois Department of Human Rights. Then, on February 1, 2010, he filed this lawsuit in Rock Island County Circuit Court. TMC removed the case to federal court. Dr. Assaf's complaint alleges[1] breach of contract and violations of the Illinois Wage Payment and Collection Act.

During 2009 and 2010, the parties tried to negotiate a new contract. During these negotiations, both parties were represented by counsel. Dr. Assaf was represented by the same counsel who now represents him in this litigation. TMC was represented by a number of attorneys, including the same attorney who represents TMC in this litigation.

In November of 2009, Tom Tibbitts replaced Andrea Coleman as Chief Executive Officer of TMC. In that position, Tibbitts had full authority to enter into a settlement agreement. Tibbitts and Dr. Assaf met for about 45 minutes to an hour on February 22, 2010, only a few weeks after Dr. Assaf had filed the instant lawsuit, in an effort to resolve the issues between them. Tibbitts brought with him to the meeting a one page document as follows:

**Trinity Medical Center**
**Dr. Assaf: Settlement Position**

| 1. Contract & Renewals | **Option 1:**<br>Medical Director of Epilepsy Program only, 1/1/10 to 12/31/11, at $62,500 per year. No salary for 2009 | **Option 2:**<br>Pro-rated payment of wages for 2009 as Medical Director of Epilepsy Program for the period 1/1/09-9/17/09 in the amount of $31,369 salary for 2010 would be $50,000. |
|---|---|---|

---

[1] The original complaint included count II, which alleged a breach of third party beneficiary contract. This claim has been dismissed.

4

|  | Notes:<br>1. Both options require acceptable documentation approved by TMC Administration<br>2. Dr. Assaf is Medical Director of Epilepsy Program for 2010 |
|---|---|
| **2. Directorship of Neuroscience Unit** |  |
| **3. Attorney Fee** | *$15,000* *** |
| **4. Compensation Damages** | *$15,000* *** |
| **5. Release** | Dr. Assaf release TMC from all charges and claims |
| **6. Continuing Medical Education** | Agreed |
| **7. Visa Fees** | Agreed |
| **8. Non-Compete Clause** | Agreed |
| **9. Termination Notices** | Agreed, but must include expunging all adversarial memos from Dr. Assaf's personnel records related to the Medical Director Position |
| **10. H1-B Visa** | Agreed |

***[These amounts were handwritten. The remainder of this document was in type.]

At this meeting, Tibbitts and Dr. Assaf reached agreement on the dispute. Shortly after this meeting, Tibbitts drafted another document, titled "Settlement Agreement," and on February 26, 2010, Tibbitts and Dr. Assaf signed that document. This Settlement Agreement was as follows:

**Trinity Medical Center/Dr. Bassam Assaf**
**Settlement Agreement**

| 1. Contract & Renewals | Salary:<br>    2009: $50,000<br>    2010: $50,000<br>    2011: $50,000<br>_____<br>Notes:<br>    1. Acceptable documentation approved by TMC Administration is required. The 2009 actual amount submitted may be for less than the $50,000 based on approved documentation submitted by Dr. Assaf, but salary will be paid at $50,000 in consistency with H1-B Visa Rules.<br>    2. Dr. Assaf served as Medical Director of Epilepsy Program for 2009. |
|---|---|
| 2. Directorship of Neuroscience Unit | Dr. Assaf's title will be changed to Director of the Neuroscience Program effective January 1, 2010. Directorship position will continue until December 31, 2011. Automatic yearly renewal as per original epilepsy contract. Prior to the 90-day review period, the two parties will meet to discuss any future amendment to the terms of the contract. stroke protocol developed during 2010 with mutual plan for implementation of a certified Stroke Program by the end of 2011. |
| 3. Attorney Fees | $15,000 paid by Trinity |
| 4. Compensation Damages | $15,000 paid by Trinity |
| 5. Releases | Dr. Assaf releases TMC from all charges and claims filed against Trinity. It is further agreed there will be mutual release between Dr. Assaf and Trinity of all and any claims related to the Epilepsy Medical Directorship agreement. There will be no specific release language for individuals except to the extent they are included with Trinity as the principal entity. The mutual release will exclude situations of claims connected with third parties and exclude community physicians having relationship with Trinity. |
| 6. Continuing Medical Education | $3,000 per year paid by Trinity |
| 7. Visa Fees | $2,000 and employer fees paid by Trinity |
| 8. Non-Compete Clause | No non-compete agreement |
| 9. Termination Notices | Trinity will expunge all adversarial memos from Dr. Assaf's personnel records related to the Medical Director position. Trinity asserts there are no adversarial records that exist in Dr. Assaf's Medical Staff files. |
| 10. H!-B Visa | Trinity agrees to assist Dr. Assaf in obtaining his H1-B visa for the new Neuroscience Directorship position. Trinity will petition for extending Dr. Assaf's H1-B visa status until December 31, 2011. |
| 11. Recruiting | Trinity agrees to assist Dr. Assaf in the recruitment of additional neurologists and/or nurse practitioners for the neurosciences program. Trinity and Dr. Assaf realize the need for additional neurology providers to cover the program duties and needs. |

    /s/ Tom Tibbitts    2/26/10        /s/ Bassam Assaf MD   2/26/10
    Tom Tibbitts, CEO   Date         Dr. Bassam Assaf     Date

    Immediately following this meeting, indeed on the same date as the Settlement Agreement

was signed, Dr. Assaf's counsel sent letters to the EEOC and the Illinois Human Rights Commission, attaching pleadings that withdrew Dr. Assaf's charges. A series of emails, letters and phone calls between Dr. Assaf, Tibbitts and counsel ensued, beginning on February 26, 2010 and concluding on April 26, 2010. As is pertinent, those emails were as follows:

- On February 26, Chad Larson (an attorney at the law firm representing Dr. Assaf) sent an email to Robert Park (counsel representing TMC) that read, "Please let me know if I have your authority to file the attched [sic] Stipulation to Dismiss."

- On February 28, Robert Park, replied to Larson's email, copying Plaintiff's primary counsel Steve Fieweger, TMC's in-house counsel, and Dr. Assaf's immigration attorney. The email stated, "The Stipulation looks fine to me. I am in the process of preparing a Settlement Agreement, which will call for dismissal of all claims, including this one. You may want to wait until the Settlement Agreement is signed before filing the dismissal."

On March 1, Steve Fieweger responded to Park, saying,

> Tom Tibbitts and Dr. Assaf have already signed a settlement agreement prepared by Mr. Tibbitts that I will fax you this morning. I have sent the withdrawl [sic] of charges notices and letters to all agencies last Friday. Please have TMC make one $15,000 check payable to our firm .... Dr. Assaf will need two separate checks ... We will also need to sign the new employment agreement that now runs through 12/31/2011. Please advise if you, Eric or Mr. Tibbitts will be preparing this."

- On March 2, Dr. Assaf sent an email to Tibbitts that began: "The following is a list of items and actions directed towards executing our agreement." All 11 items shown on the February 26 Settlement Agreement are addressed in the list, showing what Dr. Assaf had done with respect to each item.

- On March 4, Robert Park sent an email to Steve Fieweger to confirm and follow up on an earlier telephone call. In that earlier conversation, the two attorneys had apparently agreed that instead of paying Dr. Assaf for the work he had performed in 2009 (as indicated in the Settlement Agreement), the $15,000 compensatory damages would be increased to $65,000. In addition, the attorneys had agreed that Dr. Assaf's status as an employee of TMC would be "from now until the end of 2011" but that Assaf could not perform any work for the hospital and the hospital could not pay Dr. Assaf until his visa status had been established. The email concluded, "Once we get your OK on both the revised Settlement Agreement and the Neuroscience Director Agreement, we should be able to order settlement checks and get this matter concluded. It is our plan to do everything possible to expedite that process."

- On March 5, Robert Park sent Steve Fieweger a lengthy email. The email began, "Yesterday we sent you a revised Settlement Agreement on this case. We now are sending

7

herewith a proposed Neuroscience Director Agreement, in accord with the settlement, providing for employment of Dr. Assaf as Director of Neuroscience." Attached to this proposed Neuroscience Director Agreement were two documents: a Position Description, and a Monthly Time Register, which was described by Park as "similar to the time register required under the old Medical Director Agreement." The email raised several immigration-related concerns. Park then stated, " As soon as the Settlement Agreement and Neuroscience Director Agreement are signed by Dr. Assaf and returned to us, we will take appropriate steps to have the agreements signed by Tom Tibbitts on behalf of Trinity, order the settlement checks payable under the Settlement Agreement, and furnish a signed copy of the Neuroscience Director Agreement to [immigration counsel]. I would also ask that, once Dr. Assaf has signed the agreements, you file the dismissal of the case between the parties pending in federal court and send me copies of the documents showing that you and Dr. Assaf have taken steps to have all employment discrimination charges withdrawn or dismissed."

- On March 15, Dr. Assaf sent an email to Tibbitts, suggesting another meeting "to follow-up directly on our agreement items." He then updated his progress on items 1 and 2 from the "Settlement Agreement." With respect to Item 1, Dr. Assaf stated, "I have the documents supporting the hours. We can finalize the format in the meeting if you have any questions." As to Item 2, he enclosed "an amendment to the contract along with the original contract based on our agreement." He concluded, "I am interested in properly finalizing this and pursuing our mutual plans for the neuroscience program."

- In a letter dated March 15, Steve Fieweger wrote to Bob Parks that the revised settlement agreement and proposed employment agreement "are much more than what Dr. Assaf and Tom Tibbitts agreed to do." Fieweger characterized the settlement agreement as "not necessary" in light of the February 26 agreement, which was binding on both parties. In lieu of the Neuroscience Director Agreement suggested by TMC, Fieweger suggested "a one page Amendment to the 2005 agreement," stating that Dr. Assaf's employment was extended under the same terms.

- On March 18, Dr. Assaf sent another email to Tibbitts, enclosing a "PDF of the signed Neuroscience Med. Directorship Agreement." This agreement was "based on the original epilepsy agreement[2] with changes based on our February 26, 2010 agreement." The email then summarized the five changes Dr. Assaf had made to the Neuroscience Medical Directorship agreement. Tibbitts responded, requesting that Dr. Assaf provide him with a "re-lined [the Court assumes this meant "red-lined"] version so that I can review your suggested changes. They would appear to be consistent with what we have agreed to, but just need to verify."

- On March 19, Dr. Assaf sent another email, advising Tibbitts that someone from his office

---

[2]Recall that the parties sometimes referred to the 2005 MDA as the epilepsy agreement.

would be dropping off a new signed PDF version of the contract, "with Track Changes" and "with the Addendum."

- On March 22, Tibbitts emailed Dr. Assaf, advising him that TMC had revised all of its Directorship Agreements since Dr. Assaf's original 2005 MDA Because the documents Dr. Assaf had sent "work off the old contract," they were unacceptable to TMC and had to be revised to be consistent with the new format. Tibbetts stated that he had sent the revised agreement to Assaf "in the new format" and that this agreement "addresses all of the items that we agree on."

- On March 23, Dr. Assaf responded to Tibbitts, pointing out what he felt was "extensive and what I felt at times to be unbalanced language regarding contract termination ... that constitutes about 2/3 of the body of the contract." He also pointed to a "discrepancy ... between the first term and the following terms." He suggested a meeting between himself and TMC's legal staff to discuss these issues.

- On April 20, Tibbitts sent an email to Dr. Assaf. This email briefly summarized the two month long effort to resolve the issues between them, and then summarized a March 31 meeting between Dr. Assaf and his attorney, and a TMC representative and legal counsel. In the letter, Tibbitts conveyed that TMC agreed to 2 of the changes discussed at the meeting, one relating to Dr. Assaf's pursuit of a faculty position and the other to allow limited participation in TMC's 403(b) plan. The letter concluded by saying that no further changes would be made to the agreement and that if Dr. Assaf did not sign the agreement by 4:30 pm, April 23, "other arrangements" would be made for medical leadership of the neuroscience services.

- On April 22, Steve Fieweger sent a letter to Tamara Byram, one of TMC's in-house counsel. The letter proposed changes to the Directorship contract, which he summarized. He concluded by expressing surprise at the 48 hour deadline for signature and by stating that if the deadline were imposed, he would file a motion in federal court to enforce the settlement agreement.

- On April 23, Dr. Assaf sent an email to Tibbitts, summarizing the parties' efforts, expressing optimism that they could reach agreement on changes to that agreement, and then stating that the threat to make other arrangements was "in clear violation to what you, on behalf of Trinity, explicitly agreed with me on February 26, 2010, that 'Dr. Assaf's title will be changed to Director of Neuroscience Program effective January 1, 2010. Directorship position will continue until December 31,2011.'" He concluded by stating that "all efforts will be made to enforce the settlement."

- On Monday, April 26, 2010, Tibbitts sent Dr. Assaf an email, copied to *inter alia* Steve Fieweger, that read in its entirety, "Since you chose not to sign the agreement on Friday April 23, 2010, all previous agreements are null and void and there will be no further negotiations on this matter."

The language regarding the term of the 2005 MDA and the renewals and termination thereof, which Dr. Assaf wanted to adopt as governing language in the new Neuroscience Director Agreement, reads as follows:

E.  Terms of Agreement:

> The term of this Agreement shall be from October 1, 2005 ("Employment Date") through December 31, 2007. This agreement will automatically renew for an additional one year term at the expiration of such term unless Physician provides written notice to the other party of his intent not to renew within ninety (90) days of the expiration date (the "Roll Over Date"). Thereafter this Agreement will automatically renew for subsequent additional one(1) year terms at the expiration of each term unless Physician or Hospital provide written notice to the other party of its intent not to renew within ninety (90) days of the expiration of said term. If this Agreement is terminated prior to the end of the first year for any reason, the parties will be precluded from entering into a similar contract with each other until after the end of the first year. This Agreement may be terminated prio to the end of the term in the following circumstances:
>
> 1.  The Hospital shall be entitled to immediately terminate the Medical Director's employment for any one of the following reasons:
>
>     a.  Failure of the Physician to meet the requirements of the Medical Staff membership of the Hospital, or failure of the Physician to be approved and appointed to the Medical Staff of the Hospital in accordance with the Medical Staff Bylaws.
>
>     b.  Physician's Medical Staff membership or privileges at Hospital are revoked, reduced, suspended or restricted, except for suspensions due to medical records completion, in accordance with the Medical Staff Bylaws; or
>
>     c.  Failure of Physician to meet the qualifications of Section A herein.
>
>     d.  Physician substantially defaults in the performance of his duties hereunder, provided notice of the default has been given to Physician, at least thirty (30) days have elapsed since notice was given and Physician has failed to cure the default within that time period; provided , however, that if Physician is actively pursuing a cure and the cure is expected to take longer than 30 days, then Physician and Hospital will make good faith efforts to negotiate an appropriate cure date or/and cure plan which shall be made in writing.
>
> 2.  This Agreement may be terminated upon mutual agreement of the parties.

The language in the Neuroscience Director Agreement proposed by TMC reads as follows:

**E.** **<u>Term and Termination of Agreement:</u>**

1. The initial term of this Agreement shall be two (2) years, beginning on January 1, 2010, through December 31, 2011. At the end of the initial term, this Agreement shall automatically renew each additional year for a one-year term, unless terminated as hereinafter provided. However, prior to ninety (90) days before the end of each term, the parties may renegotiate this Agreement. Notwithstanding the stated term, this Agreement may be terminated as herein provided:

    a. After the initial two-year term, either party hereto may voluntarily terminate this Agreement at any time, without a showing of cause, upon the giving of ninety (90) days written notice to the other.

    b. The employment relationship shall automatically terminate in the event Physician dies or suffers a disability. For purposes of this section, the term "disability" shall refer to the inability of Physician to perform one or more of the essential functions of his or her employment under this Agreement due to any physical or mental impairment with or without any reasonable accommodation required by law, which continues for a period of greater than twelve (12) weeks.

    c. Hospital shall have the right to terminate Physician's employment under this Agreement "for cause" upon three (3) days written notice in the event: (i) Physician ceases to meet any of the qualifications as set forth in Exhibit A and attached hereto and incorporated by reference; (ii)Physician commits embezzlement or fraud; (iii) Physician engages in conduct in material violation of established medical ethics, in Hospital's sole discretion; (iv) Physician uses illegal drugs or performs services under this Agreement while impaired by any chemical substance; (v) Physician commits other similarly outrageous personal conduct, in Hospital's sole discretion; (vi) Hospital reasonably determines that Physician is failing to provide adequate patient care or is jeopardizing the safety of patients or staff; (vii) Physician engages in criminal activity or has committed a crime which in the judgment of Hospital adversely and materially reflects upon Physician's ability to provide services hereunder or adversely and materially reflects upon Hospital's business or mission; or (viii) Physician is in material breach of this Agreement, as determined in the sole discretion of Hospital. Which has not been cured within fifteen (15) days of delivery of written notice specifying the breach.

    d. Physician shall have the right to terminate Physician's employment under this Agreement "for cause" upon three (3) days written notice in the event any of the following events remain uncured for a period of fifteen (15) days

11

or longer and constitutes grounds for "for cause" termination under this subsection: (i) Hospital is in formal insolvency or bankruptcy proceedings or receivership and Hospital is unable to assign the Agreement under Section I, to a qualifying entity; (ii) Hospital is formally excluded from participating in the Medicare program by agency action; or (iii) Hospital willfully and materially breaches the material terms of this Agreement and such breach is fundamental and material to Hospital's responsibilities to Physician herein, Hospital has received written notice specifying the breach, and the breach is not cured within fifteen (15) days thereafter.

e. Either party may terminate this Agreement by written notice to the other in the event that any court or governmental authority determines that either party is, under this Agreement, operating in violation of any law or regulation and such party does not or cannot promptly take such steps as are necessary to remedy such violation; or it is in violation of Section 1128B(b) of the Social Security Act or any present or future state or federal law which would prohibit a provider of any health service from billing or receiving consideration for services to Medicare or other patient referred by Physician, or is in violation of Section 1877 of the Social Security Act or any present or future state or federal law that would prohibit Physician from making a referral to Hospital or to a hospital or facility under common control with Hospital; or that Hospital is, by virtue of this Agreement, operating in violation of the requirements for maintenance of its status as an organization under Section 501(c)(3) of the Internal Revenue Code; or Hospital reasonably determines, based upon threatened action or the advice of legal counsel that either party is in violation of such laws; provided, however, each party agrees to use their best efforts to promptly negotiate any reasonable changes to the Agreement unless the parties do not or cannot promptly take such steps as are necessary to remedy such violation. The parties acknowledge that this Agreement is executed at a time of major impending change in federal, state, and local health care delivery and reimbursement. The parties agree to negotiate in good faith in an attempt to revise or modify this Agreement in the event of material changes in federal, state or private health care delivery or reimbursement rules which affect either party's position under this Agreement in a way not reasonably foreseen at the time this Agreement was executed.

f. Termination of Physician's employment shall be governed by this Agreement or by the Hospital's corrective action policy for employees, at Hospital's sole discretion.

g. If this Agreement is terminated prior to the end of the first year of the Term, the parties will be precluded from contracting with each other for similar professional services until after the end of the first year.

## CONTRACT LAW GENERALLY

Under Illinois law, a settlement agreement is a contract and is governed by principles of contract law. K4 Enterprises, Inc. v. Grater, Inc., 914 N.E.2d 617, 624 (Ill.App. 2009) appeal denied, 920 N.E.2d 1073 (2009); cited in Damasco v. Clearwire Corp., - F.Supp. 2d -, Case No. 10cv3063, 2010 WL 3522950, *2, Sept. 2, 2010 (N.D.Ill). A contract is to be construed strictly against the drafter. Sharon Leasing, Inc. v. Phil Terese Transp., Ltd., 701 N.E.2d 1150, 1157 (Ill.App. 1998); accord Brian Properties, Inc. v. Burley, 662 N.E.2d 522, 524 (Ill.App.1996); Advance Process Supply Co. v. Litton Indus. Credit Corp., 745 F.2d 1076, 1079 (7th Cir.1984).

"For a contract to be enforceable, the material terms of the contract must be definite and certain," K4 Enterprises, 914 N.E.2d 624, which means that "the court is enabled from the terms and provisions thereof, under proper rules of construction and applicable principles of equity, to ascertain what the parties have agreed to do.'" Id., quoting Midland Hotel Corp. v. Reuben H. Donnelley Corp., 515 N.E.2d 61, 65 (Ill.1987); see also, Damasco, 2010 WL 3522950 at *2; Academy Chicago Publishers v. Cheever, 578 N.E.2d 981, 983 (Ill.1991). "A contract may be enforced even though some contract terms may be missing or left to be agreed upon, but if the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." Id. at 984.

The fact that some matters may have been left for future agreement does not necessarily preclude a finding of intent to contract during preliminary negotiations. A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chemical Group, Inc., 873 F.2d 155, 157 (7th Cir. 1989), Borg-Warner Corp. v. Anchor Coupling Co., 156 N.E.2d 513, 517-18 (Ill.1958).

## DISCUSSION

TMC attacks the enforceability of the February 26 Settlement Agreement[3] on two grounds: (1) that the parties did not intend that document to be the final expression of their agreement but rather a preliminary statement that would be later reduced to a formal writing; and (2) that the agreement required approval by TMC administration before it became final. Neither argument holds water.

TMC's assertion that the Settlement Agreement was merely a preliminary document, intended to be formalized in a later writing, is belied by the Settlement agreement itself, which contains absolutely no such language. Compare, Abbott Laboratories v. Alpha Therapeutic Corp., 164 F.3d 385, 388-89 (7th Cir. 1999). This argument is also directly contradicted by the record, in which both parties have agreed that Tibbitts had full authority to reach a settlement. See, Architectural Metal Sys., Inc., 58 F.3d at 1230; see also, Restatement (Second) of Contracts § 26 (1981); Cobb-Alvarez v. Union Pacific Corp., 962 F.Supp. 1049, 1054 (N.D.Ill.,1997). This argument is rejected. The Settlement Agreement signed by Tibbitts and Dr. Assaf on February 26, 2010 did not require a further writing before it became an enforceable contract.

Next is the question whether the Settlement Agreement required review and approval by TMC Administration or legal staff before it became final. For that argument, TMC relies on language contained under Item 1 of the Settlement Agreement is misplaced. This part of the

---

[3]Initially the Court was troubled by TMC's position, which appeared to challenge the binding effect of the February 26 Settlement Agreement. This was due to TMC's filing of a counter-claim against Dr. Assaf which asserted that the Settlement Agreement "settled all of the parties' rights and duties arising from the matters alleged in plaintiff's Complaint." (Doc. #6, p.11, ¶ 1). Because the two arguments raised by TMC in opposition to this summary judgment motion do not directly attack the binding effect of the February 26 document but merely argue that a subsequent document and review of the terms of agreement were necessary before the document became "final," it was possible to decide the questions presented. Through-out this order, the Court has disregarded any assertion or suggestions by TMC that the February 26 Settlement Agreement was not binding.

Settlement Agreement, titled Contract and Renewals, contains the following language under the sub-heading "Notes":

> Acceptable documentation approved by TMC Administration is required. The 2009 actual amount submitted may be for less than the $50,000 based on approved documentation submitted by Dr. Assaf, but salary will be paid at $50,000 in consistency with H1-B Visa Rules."

When this language is viewed in context, it cannot be interpreted as governing the entire two page Settlement Agreement. The language appears as a Note under Item 1, not as some provision that applies to each of the 11 items articulated in that document. Moreover, Tibbitts himself testified in his deposition that this language referred to the need for TMC approval of documentation of the time Dr. Assaf had spent working during 2009 under the 2005 MDA.

Nowhere in either the position document or the settlement document is there any other language or statement that remotely suggests that settlement as a whole is subject to review and approval by TMC Administration. Omission of specific language to this effect is fatal to TMC's argument that approval was required, especially because the agreement, which was drafted by Tibbitts on behalf of TMC, must be construed against TMC.

I therefore conclude that Dr. Assaf and Tom Tibbits (who had the authority to bind TMC) intended that the February 26 Settlement Agreement be a final and binding agreement[4] and that there was no need to further reduce (or, as in this case, expand) that agreement to another writing. TMC's insistence that Dr. Assaf sign a further settlement agreement was inconsistent with that intent.

The enforceability of the Settlement Agreement is not necessarily negated by the fact that

---

[4]In the process of negotiating the Neuroscience Director Agreement, the parties came to agreement on a revision to the February 26 Settlement Agreement with respect to the amount due to Dr. Assaf for the 2009 year. That modification, which is in writing, acts to modify the Settlement Agreement as to that issue.

some matters - namely Dr. Assaf's employment contract (the Neuroscience Director Agreement) - were left for future negotiation. See, e.g., Borg-Warner Corp. v. Anchor Coupling Co., 156 N.E.2d 513, 517-18 (Ill.1958), cited in A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chemical Group, Inc., 873 F.2d 155, 157 (7th Cir.1989). The details of that Neuroscience Directors Agreement were not included in the Settlement Agreement. This absence means that the parties were required to negotiate those terms.

So what is the effect of the fact that the parties were unable to successfully negotiate the terms of the Neuroscience Directors Agreement? On the one hand, the Settlement Agreement was the sole vehicle by which Dr. Assaf was able to continue his employment by TMC. In addition to being required by the Settlement Agreement, a written employment agreement was required in order to maintain Dr. Assaf's visa status. The terms of his employment were, it appears, essential to the Settlement Agreement, and one might argue that their omission renders the Settlement Agreement unenforceable.

On the other hand, however, if the Court has enough information to fill in the blanks that are disputed by the parties, then there is nothing preventing enforcement of the Settlement Agreement. If the Court eliminates the parties' *subjective* thoughts and instead focuses on the objective evidence alone - the documents and written communications including and following the Settlement Agreement - it may be possible to resolve the parties' differences about these key provisions.

Based on the documents, the major stumbling block to agreement on the Neuroscience Director Agreement was the significant difference between the language in the 2005 MDA and the language contained in the "template" contract that TMC used in its agreements with physicians in 2010. The primary area of dispute relates to contract termination; that, at least, is the only specific objection Dr. Assaf voiced in his March 23 letter to Tibbitts. Dr. Assaf insists that the Neuroscience

Director Agreement was to be based on a simple extension of the prior MDA, while TMC argues that the Neuroscience Director Agreement had to be based on the current format and content of the agreements used by TMC in 2010, rather than the format and content of the 2004 version.

The February 26 Settlement Agreement contains the following sentence, "Automatic yearly renewal as per original epilepsy contract." Does that single sentence govern termination of the Neuroscience Director Agreement as well? or is it simply limited to renewals? I find that it must govern both, because the automatic renewal is not automatic if any of the conditions authorizing termination exists. The two go hand in hand. Tibbitts' agreement that the original MDA governed renewal implicitly included agreement that the MDA governed termination.

TMS asserts that the two are "substantially similar," a statement with which I disagree. The 2005 MDA contained 4 paragraphs in about ½ page, describing when TMC could terminate the contract during a term. All 4 dealt with obvious situations in which the MDA could not continue, namely failure to meet requirements for membership on medical staff, revocation or suspension of staff privileges, or default in performance of contractual. The 2010 template which formed the basis of the proposed Neuroscience Director Agreement contains seven paragraphs in 2 full pages of single-spaced type dealing with termination of the Agreement. In Dr. Assaf's words, the template provisions for termination take up about 2/3 of the contract.

The difference is not limited to quantity. The substance of these provisions differ significantly as well, giving TMC much more flexibility than it had in the original MDA. As Dr. Assaf put it in his March 23 email, the language about contract termination is "extensive" and "unbalanced."

I find that the renewal and termination language in TMC's proposed Neuroscience Director Agreement was inconsistent with the February 26 Settlement Agreement. I further find that the

17

parties' Settlement Agreement clearly anticipated that the language of the original MDA (or "epilepsy contract") governing renewals and terminations would be imported into the new Neuroscience Director Agreement. TMC's insistence on terms that were inconsistent with the Settlement Agreement was a breach of that Agreement.

The matter of how and how often Dr. Assaf's time would be documented is a relatively minor issue that appeared, at least early on, to be in dispute as well. Whether the time is documented monthly or bi-monthly appears to simply be an administrative or ministerial and not a substantive one. It is not necessary for the Court to weigh in on this relatively trivial issue in order for there to be a binding Settlement Agreement or Neuroscience Director Agreement. This attachment to the Neuroscience Director Agreement has little or nothing to do with the enforceability of the Settlement Agreement.

## CONCLUSION

Plaintiff's motion for summary judgment is accordingly granted. The issue of damages was not part of the motion, so this Order is not a final and appealable order. The issue of damages remains for trial. This case remains set for a final pretrial conference on September 21, 2011, in person in Rock Island at 1:30 p.m. and for jury trial on October 11, 2011 at 9:00 a.m.

Parties shall file a proposed final pretrial order no later than September 16, 2011. The proposed final pretrial order shall comply with Local Rule 16.1E and F, and shall conform to Appendix 1 to the Local Rules. Jury Instructions shall be submitted in three parts: agreed instructions, Plaintiff's instructions to which Defendant objects, and Defendant's instructions to which Plaintiff objects.

ENTERED ON  August 15, 2011

s/ John A. Gorman

JOHN A. GORMAN
UNITED STATES MAGISTRATE JUDGE